# JS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MAX WILD,

                        Plaintiff,

                   - against -

THE UNIVERSITY OF PENNSYLVANIA, d/b/a
Matthew J. Ryan veterinary Hospital of the University
of Pennsylvania a/k/a Small Animal Hospital,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**14    2646**

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## NATURE OF THIS ACTION AND RELIEF SOUGHT

1. This action arises from Defendant's intentionally cruel, false and misleading advertising and false invoices and malpractice and failure adequately to inform Plaintiff the risks attendant to the kidney transplantation services it was offering.

2. Defendant promotes itself nationwide as having the expertise to perform kidney transplants on cats. Its advertising represented that the cost of such services for both the donor and recipient cats and follow-up was about $12,500, when as Defendant well-knew its charges for such services usually significantly exceeded $12,500, rendering its advertising misleading, false and fraudulent.

3. Defendant intentionally uses its knowingly false advertising to ensnare emotionally vulnerable cat owners, who, it knows, are despondent over the imminent death of their beloved cat. Defendant intends to cause and causes such owners to travel great distances, consuming precious days of the cat's remaining life, to Defendant's hospital in the hope that Defendant's experts will save their beloved cat. Defendant well knows that once a desperate cat owner has

traveled to its hospital, he will almost certainly agree to place the cat in Defendant's care rather than run the risk of its dying by traveling to another and distant institution that provides kidney transplants.

4. Defendant's advertising further represented that its charge included providing a healthy donor cat, who would be a suitable donor. It further represented that its charge included a complete work-up of both cats. It represented, in substance, its work-up of the recipient cat was to assure the cat had no conditions which would render it ineligible for a transplant or make it unduly risky to do such a transplant.

5. After a sick cat is left in Defendant's care, Defendant plays on the emotions of the cat owners to orally extract excessive interim payments in the form of deposits, all without providing any itemization of the charges.

6. Defendant intentionally delays such itemization because it recognizes that it will thus be able to extract more money than it could if it presented such statements which would otherwise be challenged. When at last it issues a purportedly detailed invoice, it is not only virtually incomprehensible to any layperson, but, to Defendant's knowledge, often contains duplicative or erroneous charges or charges for services to which the pet owner never agreed or which became necessary to correct problems which arose as a consequence of Defendant's malpractice.

7. Unbeknown to the owner and contrary to the expectation its advertisement creates, the invoice rendered is only for the owner's cat, not for both cats. After a significant period, Defendant sends an invoice for the services allegedly rendered solely to the donor cat. In this way, too, Defendant's advertisement is deceptive, false and fraudulent.

8. During the course of the controversy herein complained of Defendant secretly backdated its advertising to increase the advertised price for its services and attempted to deceive Plaintiff

-2-

into believing that the increased charge had been its advertised price at the relevant time.

9.  Additionally, in this case Defendant's care of Plaintiff's cat was below the standard of veterinary care. Such negligence caused the transplanted kidney to fail and required another transplant if the cat were to survive. Before the Defendant would clear the cat for a second transplant, it insisted that the cat be further evaluated, which required the cat to spend four weeks in another animal hospital where the cat was kept alive by thrice-weekly dialysis. This was at great and unnecessary risk to the cat and at great and unnecessary cost to Plaintiff.

10.  Plaintiff seeks to recover for damages caused by deceptive trade practices and negligence and its failure to provide Plaintiff with adequate information to make an informed decision as to agreeing to subject his beloved cat to the multiple traumas that he would have to undergo. Plaintiff also seeks a declaratory judgment that he owes nothing to Defendant and is entitled to recover from Defendant all amounts in connection with the transplant to his cat.

## JURISDICTION AND VENUE

11.  Plaintiff is a citizen of the State of New York, residing in the Town of Warwick, within the County of Orange and the State of New York.

12.  Defendant is a corporation organized and existing pursuant to the laws of the Commonwealth of Pennsylvania, with its principal office for the transaction of business in the City of Philadelphia within the Commonwealth of Pennsylvania. To the extent relevant to this action, Defendant does business through and under the name "Matthew J. Ryan Veterinary Hospital of the University of Pennsylvania," also known as the "Small Animal Hospital of the University of Pennsylvania." The services rendered which constitute the malpractice hereinafter complained of were rendered by employees of Defendant, making Defendant fully liable for such malpractice.

-3-

13.   The amount in controversy exceeds $75,000, exclusive of interests and costs.

14.   Accordingly, this Court has diversity of citizenship jurisdiction pursuant to Title 28, United States Code, Section 1332.

15.   Venue is proper in this District pursuant to Title 28, United States Code, Section 1391, in that Defendant's principal place of business, to wit its residence, is located in this District and certain of the acts and practices hereinafter complained of took place, in substantial part, in this District.

### FACTS COMMON TO ALL CLAIMS

16.   In or about 2001, Plaintiff adopted a cat then aged about seven weeks, which he named Boots.   At all relevant times Plaintiff has loved Boots and has been devoted to his care and health and well-being.  Boots lived with Plaintiff and often slept with him.

17.   In early January 2011, Boots seemed ill.

18.   Plaintiff promptly took Boots to an emergency veterinary hospital where Boots was diagnosed as being in complete kidney failure.  Plaintiff was told that emergency treatment would be able to flush from his blood the toxins that healthy kidneys remove Boots and that he could be maintained for a brief period with such treatment, but that his prognosis was dire.

19.   This news was emotionally devastating to Plaintiff.   It was a total surprise, as Boots' condition did not reveal itself until the day before it was diagnosed.  On information and belief and as Plaintiff was told, such conditions do not reveal themselves until the kidneys have virtually failed.

20.   Plaintiff left Boots under care of the emergency hospital for its temporary treatment and returned to his home to investigate the remedies that might be available to save Boots' life.

21.   Defendant University is America's fourth college and first university.  It is a member of

-4-

the Ivy League and world-famous for its many colleges and facilities, including its medical

college, veterinary college and veterinary hospital, which, on information and belief are all

divisions of the university. Its veterinary hospital is named the "Matthew J. Ryan Veterinary

Hospital of the University of Pennsylvania" and its college of veterinary medicine is located in

that hospital in Philadelphia, Pennsylvania. As used in this Complaint, the term "Defendant"

includes the veterinary hospital and veterinary college and its employees and agents. It was their

conduct as Defendant's employees which is at issue in this action and for which Defendant is

fully liable.

22. At all relevant times, Defendant maintained a web site, advertising that it performed

kidney transplants on cats. Defendant's advertisement, through which it solicited throughout the

world, stated that its feline renal transplant program included its providing a kidney from a

matching cat, referred to as a "donor." At all relevant times Defendant has maintained a

menagerie of cats that it plans to use as kidney donors in its transplant program. Defendant's

advertisement further stated that it was the responsibility of the owner of he recipient cat to

adopt and care for the donor.

23. As to the cost of the procedure, Defendant's advertisement stated: "The cost for

renal transplantation in cats (barring major complications) is approximately $12,500, which

includes a complete work-up, the cost of surgery, general anesthesia and post-operative care of

both recipient and donor cats."

24. Defendant's advertisement also made it clear that the purpose of the work-up as regards

the recipient cat was to assure that it had no inherent conditions which would likely make a

transplant unsuccessful and that it was otherwise in all respects as proper and suitable candidate

for a kidney transplantation.

25. Based upon Defendant's advertisement, Plaintiff reasonably concluded, as Defendant intended and believed he would, that the cost of getting Boots a new kidney, which would include the cost of the treatment of a donor cat would be approximately $12,500. Plaintiff also reasonably believed, as Defendant intended he would, that, if Boots had the surgery, Plaintiff would receive a single bill of approximately $12,500, which included Defendant's services for both Boots and the donor.  In reasonable reliance upon that understanding of Defendant's advertisement, as Defendant intended he would, Plaintiff took Boots to Defendant where he was admitted for the purpose of determining whether he was eligible for a transplant.

26. At the time of Boots' admission on or about January 12, 2011,  Defendant requested and Plaintiff paid a down payment in the sum of $2,500. Defendant gave Plaintiff no invoice or written estimate of the cost of the services to be rendered.

27. Shortly thereafter Defendant's designated representatives explained the nature of the procedures and what Plaintiff could reasonably expect as a result of agreeing to submit his cat to them to receive a new kidney.  Such explanation included a representation that the "work-up" referred to in the advertisement would uncover any of the cat's conditions which might make it a reasonable likelihood that a transplantation would not be successful or anything that might make him not a suitable candidate for such procedure.

28. Defendant's representatives gave Plaintiff no reason to believe the cost of the transplantation procedure would likely exceed the advertised price of $12,500.00.

-6-

29. Defendant's representatives also advised Plaintiff that the cat would have to be put on certain drugs to prevent the rejection of the transplanted kidney.  The drugs specifically referred to was cyclosporine and a steroid.

30.  At no time did Defendant's representatives advise Plaintiff either that an excessive level of cyclosporine at the time of the surgery was toxic to the transplanted kidney and would likely cause it to fail or that such drugs would also make  the cat likely to develop cancer, which would threaten his life even if the transplantation were successful.

31. Reasonably relying upon such information as Defendant furnished in its advertisement and orally, Plaintiff agreed  Defendant could begin the work-up and evaluation.

32.  The evaluation process continued for several days, after which Defendant advised Plaintiff that Boots was eligible for a transplant and that a search for a matching donor was being conducted.  During the evaluation period, Boots received treatments which removed the toxins from his body that would otherwise be removed by the kidneys if they were working.

33.  During this evaluation period and afterwards Defendant orally demanded further payments without furnishing Plaintiff with any detailed invoice of such charges. In compliance with Defendant's demands Plaintiff made further payments on or about the following dates and in the following amounts: January 29, 2011 -- $3,000; March 1, 2011 -- $5,000; April 2, 2011 - $2,500;  May 5, 2011 -- $10,000.

34.  Plaintiff made further payments demanded by Defendant aggregating approximately $1,500.00.

35.  Plaintiff has paid Defendant a total of approximately $25,000, which is approximately twice what Defendant advertised would be its charges for a single transplant for both the donor and recipient cats.

36.  On or about February 7, 2011, Defendant performed the first transplant operation on Boots. The new kidney appeared to begin working and but failed very shortly thereafter.

37.  The new kidney had not been rejected and was receiving a proper supply of blood and other vital nutrients.  Moreover, the donor cat appeared to be healthy following the surgery and, upon information and belief, as of the date of this complaint, remains healthy and expected to live out a normal life.  Moreover, Defendant thoroughly inspected the kidney to be donated before removing it from the donor cat and transplanting it into Boots.  Accordingly, there is no reason to believe that the donated kidney was in any way defective.

38.  As alleged above, to prevent rejection of a transplanted kidney, the recipient cat is given a drug called cyclosporine. This is drug administered while the cat is being evaluated for the transplant and  is continued thereafter. The level of cyclosporine in the cat's blood is frequently monitored and this was done in Boots' case during the period before the transplant surgery took place.

-8-

39.  While cyclosporine is essential to prevent rejection, Defendant has admitted that an excessive level of that drug a cat's blood is toxic to kidneys and can cause them to fail. Accordingly, sound medical practice is not to do a transplant if the level of cyclosporine in the recipient cat's blood is significantly above a therapeutic level.

40.  At the time Defendant performed the surgery on Boots, his cyclosporine level was far above the therapeutic level as Defendant well knew. It was not necessary that Defendant operate on Boots on the day Defendant chose. Without unreasonably jeopardizing Boots' health or the success of the planned transplant, Defendant could have postponed the surgery for several days, while maintaining Boots on the treatment that he had been receiving to flush the toxins until Boots eliminated sufficient cyclosporine to get his blood level of that drug to a therapeutic level making it save to perform the transplant.

41.  Although the new kidney appeared to be working shortly after the surgery, it very soon failed, but was not rejected. Moreover, tests showed that the failure was not due to a blood clot which would have interfered with the blood circulation to the transplanted kidney. it is therefore apparent that the failure was due in significant part, if not entirely, to the fact that at the time of the transplant surgery, the level of the drug cyclosporine in the excessive level as Defendant has admitted.

42.  On or about May 24, 201, Defendant admitted that the high level of cyclosporine might have been the cause or contributing cause to that kidney's failure, sending Plaintiff an email stating, "I think that the ability of Boots not to metabolize cyclosporine properly and chronically

high levels contributed a great deal to the ultimate loss of the graft [the originally transplanted kidney]." After referring to a pathological report obtained by Defendant on the failed kidney, Defendant continued, "I think that if the native disease [i.e., something inherent in Boots make-up] caused failure of the first graft within a few weeks, we would have already seen an effect on the second graft [the second kidney, which was functioning properly]."

43.  On information and belief, but for the excessive cyclosporine level at the time of the surgery, the transplanted kidney would have worked and Boots would have been restored to health. (In fact Boots received a second transplant which was successful and the only material difference in the two surgeries is that his cyclosporine level was within a therapeutic range at the time of the second surgery.)

44.  Within a very brief period after the first transplant surgery, Defendant recognized that the newly transplanted kidney could not be made to function.  This meant that Boots' life was in grave and imminent danger, particularly as his condition had been weakened by the long period of non-functioning kidneys and the serious surgery he had just been put through.  Therefore, keeping him any longer at Defendant's hospital unnecessarily jeopardized his life and created unnecessary and unreasonable expenses. Finally, on February on February 20, 2011, at least ten days after Defendant knew that the newly transplanted kidney could not be made to work, Defendant admitted that the transplant had failed and the new kidney could not be made to function.

45.  On or about February 20, 2011,  Defendant told Plaintiff that the operation had been a

-10-

failure, but stated that it would be possible to give Boots a second kidney transplant.

46.  However, Defendant insisted that before doing another transplant, it wanted to subject Boots to further tests.  The "work-up" in Defendant's eligibility testing procedure, which it set forth at length in it advertisement referred to above, should have been fully adequate to determine whether any cat, including Boots, was eligible for a transplant. No additional eligibility testing should have been reasonably required before a second transplant after a first one failed very shortly after the transplant operation.

47.  It would be negligent and a breach of the agreement between Plaintiff and Defendant, if Defendant's eligibility testing program was inadequate to reveal any condition, including the reason for the failure of the cat's kidneys, which, with a reasonable degree of medical likelihood, might cause a transplant to fail or otherwise make the cat ineligible for any transplant, much less a second transplant.

48.  Defendant waited an excessive number of days before admitting that the transplant had failed.  This unreasonably put Boots' life and health at risk and also resulted in his being kept at Defendant hospital for a significantly longer period than was medicinally appropriate.  This also unnecessarily and unreasonably increased Defendant's billing for Boots' hospitalization.

49.  Inasmuch as Boots' life was then entirely within Defendant's control and he would likely soon die without a second transplant, Plaintiff was without the ability to resist Defendant's demands for further eligibility testing.

-11-

50.  To keep Boots alive during the further testing, as a condition of agreeing to perform a second transplant, Defendant advised Plaintiff that Boots would have to receive hemodialysis ("dialysis") as the measures that had been followed by Defendant during the pre-transplant could no longer sustain him until results of the new tests could be obtained. Defendant advised Plaintiff that it was unable to provide dialysis services and that Boots should be taken to the world-famous Animal Medical Center (the "AMC") located in New York City, where he could receive life-saving dialysis, which would continue until Boots received a second transplant. Defendant's advertisement did not reveal that it did not have the ability to provide dialysis.

51.  The period that Defendant kept Boots at its hospital after knowing that the transplant had failed, not only negligently put Boots' life at great risk, but resulted Defendant imposing upon Plaintiff a great deal of unnecessary, unjustified and unreasonable charges for that period.

52.  After Defendant told Plaintiff of Boots dire condition and the need to transfer him to the AMC, Plaintiff personally raced with Boots from Defendant's hospital in Philadelphia, Pennsylvania to the AMC.

53.  At the AMC Boots received dialysis three times a week at a cost of approximately $10,000 per week. Boots remained at the AMC for approximately four weeks, during which time he received dialysis three times each week for an aggregate cost to Plaintiff of in excess of $33,000.

54. During Boots' entire stay at the AMC, he remained under the care of Defendant. The doctors and staff at the AMC were in communication with Defendant on a daily basis if not more frequently. During Boots' entire hospitalization at the AMC, Defendant directed and was in charge of Boots' his care, medication and tests to be performed on him, as though Boots was a patient in Defendant's hospital. The duration of Boots' hospitalization at the AMC was a matter entirely within the discretion of Defendant.

55. As hereinabove alleged, if there were a foreseeable risk that some inherent condition in a potential recipient cat might cause a transplanted kidney to fail, it would be negligent not to perform such tests as might reasonably reveal the existence of such condition. Accordingly, there was no reasonably medical justification not to perform the second transplant promptly after the first had failed, in that, as Defendant then well-knew, that it was likely that the first transplant had failed, not due to any condition inherent to Boots, but rather due to its negligent decision to perform the transplant at a time when Defendant knew that the level of cyclosporine in Boots' blood was far above what Defendant then and there knew, not only to be not therapeutic, but toxic to a transplant and reasonably likely to cause its failure. It is, therefore, obvious that the additional tests were unnecessary, as they were unlikely to provide a reason to deny him a new kidney. The delay was not only unnecessarily costly, but, as Defendant has admitted, the dialysis treatments placed Boots at great risk and could have caused his death and created complications which would imperil a second kidney transplant. Placing Boots at such risk, which was unnecessary, was negligent.

56. On or about March 20, 2011, Defendant advised Plaintiff that Boots was eligible for a

second kidney transplant.

57. On or about March 21, 2011, Boots was discharged from the AMC and Plaintiff immediately brought him back to Defendant in Philadelphia, where a second matching donor was located and selected by Defendant.

58. On or about March 22, 2011, a second transplant operation was performed and Boots received a new kidney which worked satisfactorily until his death in August 2012 when he had to be euthanized due advanced cancer, which he undoubtedly developed due to the drugs that suppressed the rejection of his kidney. This proved that the first transplant would have been successful but for Defendant's decision to operate when the cyclosporine level was excessively high, representing a threat to the transplant.

59. On or about March 31, 2011, Defendant informed Plaintiff that Boots would be discharged on or about April 1, 2011.   On April 1, 2011, Plaintiff drove to Philadelphia to take Boots home.

60. Since before Boots became ill Plaintiff has been semi-retired, living on his social security and IRA distributions.  Thus, even $12,500 represented a substantial strain on his limited income.  By the time of Boots' discharge Plaintiff was having substantial financial difficulties as a consequence of the vastly greater cost for Boots' care than anyone could reasonably have anticipated.  He had been making to Defendant and to the AMC.  Plaintiff was no longer able to make payments from his savings and advised Defendant that he was

-14-

applying for a mortgage on his theretofore paid up home in order to pay Defendant, the AMC and numerous other expenses for Boots' care and needs which cost additional thousands of dollars.

61. All of the costs and expenses of the AMC and many other costs and expenses following the second transplant operation were due to Defendant's malpractice.

62. On or about April 1, 2011 when Plaintiff went to Defendant's hospital to bring Boots home, he was accosted by a representative of Defendant's billing department, who demanded that Plaintiff pay an additional sum, in excess of $20,000. At that time Plaintiff had no idea of how much he had paid Defendant and how much might be legitimated be owed. He was incredibly grateful that Boots was alive, had a new working kidney and was going home. Defendant's medical staff also had repeatedly told him that Boots was far from "out of the woods" and would need careful attention monitored and directed by Defendant's medical staff on a virtually daily basis, which would involve direct communication by telephone between Plaintiff and the staff, email communication between them and Boots' veterinarians located in Warwick, New York and in various facilities in New Jersey.

63. Plaintiff advised said representative of Defendant's billing department that a mortgage application was in progress which would provide the funds necessary to pay all of the charges and allow Plaintiff to meet his other living expenses. Said representative was unrelenting and threatened that if the account were not paid immediately, Defendant would refer the matter to collection. This would seriously damage Plaintiff's existing excellent

-15-

credit rating and likely imperil his ability to secure the mortgage or secure a mortgage at a reasonable rate of interest. The representative further implied the further and essential continuing care might not be forthcoming or might be delayed if payment were not made. The representative said that if Plaintiff would sign a credit application Defendant would give him an additional period within which to make the payments. Plaintiff was in a serious emotional state, grateful for having his beloved Boots, but fearing the consequences to Boots and to his ability to secure the essential mortgage if he did not capitulate. Accordingly, he did sign the credit application. He did not then know how much he had paid Defendant or how much he might legitimate owe it, if anything. Plaintiff was not then in an emotional state such that he could resist Defendant's demands. He needed to get Boots, who was in a weakened state and take him on the long trip home and then begin the extensive care that Boots would need if he were to have a chance of recovering.

64. Plaintiff also adopted took home both donor cats.

65. Thereafter and only after receiving substantial payments from Plaintiff, as it had demanded, did Defendant send Plaintiff a detailed invoice. Plaintiff was surprised at receiving a detailed invoice as he reasonably anticipated from Defendant's advertisement that he would receive a simple bill for the entire package, which included the surgery for Boots and the donors' in the amount approximated in Defendant's advertisement.

66. Defendant's invoice is stated in technical medical terminology, which ranged from difficult to impossible for a layman to understand and provided no basis for verification as no

periodic invoices or charges were furnished on a less frequent basis, such as daily or weekly.

Nevertheless, Plaintiff promptly reviewed the invoice to the best of his abilities and promptly

protested to Defendant in considerable detail. In response, Defendant reexamined its invoice

and acknowledged that it contained certain errors and sent Plaintiff a revised invoice and an

explanation of the admitted errors. Plaintiff promptly protested that invoice, as well.

Defendant's invoices are inaccurate and unreliable in material respects as Defendant has

admitted.

67.  Defendant has billed Plaintiff a total of approximately $36,000 for two transplants

services for Boots alone, which is approximately $11,000 more than its advertised price of

$12,500 for its services for both the recipient and donor cats, assuming that the need for the

second transplant was not due to Defendant's negligence.

68.  Long after Defendant sent Plaintiff the aforementioned invoices to Plaintiff for what

turned out to be only for Boots' care, it sent two further invoices, one for each of the donor

cats. These invoices aggregated approximately $7,000. This would have brought Defendant's

charges to approximately $43,000 for services that should have been about $12,500 or about

$25,000 if the second transplant were not required as a consequence of Defendant's

negligence.

69.  Promptly after receiving Defendant's invoice, Plaintiff sent communications to

Defendant timely challenging it.  There were a number of email exchanges between the

parties.   During the exchanges between the parties, Defendant admitted its billings contained

errors and that Plaintiff had other serious concerns.  Negotiations regarding Defendant's charges made it clear that Defendant was not relying upon the credit application that he been virtually extorted from Plaintiff the day he took Boots home.  Unfortunately, no agreement could be reached.

70.  Plaintiff was shocked at receipt of the invoices for the two donor cats in that he reasonably believed from Defendant's advertisement, as Defendant intended he would, that there would be a single bill for the transplant, including all of Defendant's services for both the recipient and donor cats.

71.  Plaintiff promptly protested the bills for the donor cats.

72.  Plaintiff has paid Defendant an amount which is essentially equal to the advertised cost of two transplant operations, including the cost of the donor cats' treatment, approximately $25,000.

73.  After Plaintiff protested Defendant's bill as greatly exceeding Defendant's advertised price of approximately $12,500 for a transplant, including all services for both the recipient and donor cats, Defendant secretly modified its on-line advertisement by stating the estimated costs of a transplant was between $12,000 and $16,000. Defendant did this a manner which it believed would conceal the fact of the amendment and allow it to say to anyone questioning a charge in excess of $12,500 that it had always estimated the charges at between $12,000 and $16,000.

-18-

74. Although making this material change in the advertisement, Defendant did not change the date of the advertisement, obviously in order to conceal such change. Defendant obviously believed it could thereby trick Plaintiff and any others in Plaintiff's position, into believing that the charge at the time Plaintiff gave Boots over to Defendant's care, was between $12,000 and $16,000, not $12,500, as its relevant advertisement explicitly stated.

75. Defendant intended that its ex post facto amendment would allow it to point to the advertisement and argue that this is what Defendant had always said would be the cost of a transplant.

76. Defendant took advantage of its deceitful amendment of its advertisement by sending Plaintiff two emails asserting that the advertisement said that the cost of a transplant would be between $12,000 and $16,000, without revealing it had made a material increase in the cost of such services only after Plaintiff objected to its charges. On or about June 11, 2011, Defendant sent Plaintiff an email in which Defendant stated, "On the web site, it says that the cost ranges from $12,000 - $16,000.00." Defendant's second email, dated June 20, 2011, stated, in relevant part, "It is clear on the web site that the ESTIMATED cost BARRING ANY MAJOR COMPLICATIONS is 12 16 thousand dollars." Neither email admitted that the advertisement had been changed only after Plaintiff complained, obviously in the hope and belief that Plaintiff had not made a copy of the original advertisement and would conclude that his recollection was faulty. Accordingly, Defendant's above-quoted emails were intended to deceive Plaintiff as to what the advertisement said at the relevant time, namely, when Plaintiff found it, and in reliance upon it brought Boots to Defendant.

77. As hereinabove alleged, the day after Plaintiff brought Boots to Defendant he met with the surgeon in charge of the transplantation program, he was given some oral advice regarding the future course if he were to agree to submit Boots to the transplantation program. Although Defendant advised Plaintiff of the need for drugs which would prevent rejection of the transplanted kidney, it did not advise him that these drugs would also make it likely that Boots would develop cancer, which would be life-threatening, even if the transplant were successful.  Had Defendant given such full and necessary advice, Plaintiff likely would not have agreed to the transplantation procedure or would have obtained information from Defendant and others as to the risk of developing cancer and how to be alert for it should he agree to the transplantation.

78. Although the second transplantation was successful and, after a lengthy period of intense care at home, Boots began to return to a "normal" life, Boots developed cancer. Because Defendant had not given Plaintiff warning about the risk of cancer it developed and became inoperative or otherwise treatable within a relatively short time after Boots was able to begin returning to a "normal" life.

79. Almost overnight Boots' cancer deprived him of the ability to use his hind legs.  Tests which Plaintiff had done showed that there was no potentially successful treatment. Accordingly, Plaintiff was left with no humane option but to have Boots euthanized, which he did on or about August 7, 2012.

80. As a consequence of Defendant's improper and negligent failure to advise Plaintiff of

-20-

the risk of cancer, Boots was unnecessarily subjected to the trauma of two transplantation surgeries, multiple dialysis treatments and several months of hospitalization, all of which constituted cruel and inhumane treatment of Boots and great emotional trauma for Plaintiff.

81. As a consequence of Defendant's failure to fully apprise Plaintiff of all of the risks, Plaintiff suffered great additional financial expense as a consequence of Defendants' malpractice and failure to provide full and complete advice regarding the risks following even a successful transplantation, which aggregated many thousands of dollars.

82.  Defendant is liable for all of Plaintiff's financial harms, which included multiple visits to other veterinarians, expensive medications and testing, the cost of multiple trips to Philadelphia and New York City to visit Boots, meet with his doctors and attend to his needs which were several thousand dollars.

## COUNT ONE

### (Declaratory Judgment Based Upon Implied Contract Created by Advertisement Unjustly Enriching Defendant)

83.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 82 of this Complaint as if set forth in full.

84. Defendant's above-described advertisement constituted its agreement with Plaintiff and others who might in response to it bring their cats to Defendant for a kidney transplant,

-21-

that the price of a transplant would be approximately $12,500, which would include all services Defendant rendered to both the recipient and donor cats.

85. By reason thereof, Plaintiff is entitled to a declaratory judgment that his total obligation to Defendant for its services for both Boots and any donor cat is $12,500, assuming that only a single transplant was necessary and $25,000, in the event that a second transplant would not have been required but for Defendant's negligence.

86. Accordingly, the Court should enter judgment declaring that Plaintiff's maximum obligation to Defendant does not exceed $12,500 per necessary transplant and all charges in excess of such amount are void and uncollectable.

## COUNT TWO

### (Deceptive and Fraudulent Advertising)

87. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 82 of this Complaint as if set forth in full.

88. Defendant's advertising of its transplant services as hereinabove described was misleading, deceptive, false and fraudulent, in that it was intended to and did mislead members of the public, including Plaintiff, into reasonably believing that the cost of a transplant, including all of the services for both the recipient and donor cats would be approximately $12,500 when, as Defendant at all relevant times well knew, its usual price for such services (absent major complications) was significantly in excess of that sum.

-22-

89.  Plaintiff reasonably believed that Defendant would charge him approximately $12,500.00 to provide Boots with a new kidney and that this cost included the services to be rendered to the donor cat.

90.  By reason thereof, Plaintiff should not be obligated to pay Defendant more than $12,500 for a single transplant, including the services for the donor cat.

91.  In the event that the first transplant failed through no fault of Defendant, Plaintiff should not be obligated to pay Defendant more than approximately $25,000 for two transplants, including the services to both donor cats.

92.  As Plaintiff has paid Defendant more than $25,000, permitting Defendant to exact any further payment from Plaintiff would damage Plaintiff and reward Defendant for its deceptive, misleading, false and fraudulent advertisement for its transplant services. Accordingly, Plaintiff is entitled to judgment holding that he does not owe Defendant any more money than he has paid assuming, arguendo, that the first transplant did not fail due to Defendant's negligence.

## COUNT THREE

### (Negligence)

93.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 82 of this Complaint as if set forth in full.

-23-

53. At the time that Defendant chose to perform the first transplant on Boots, it was reasonably foreseeable that if Defendant went ahead with Boots' surgery while his cyclosporine level was so high that it created a great and medically unnecessary risk that the newly transplanted kidney would be damaged beyond repair by the toxic level of cyclosporine. .

94. Boots could have been maintained on the treatment he had been receiving from Defendant for several more days before the first transplant surgery without jeopardizing his life or the success of the planned operation. This would have allowed the cyclosporine level to drop to a safe and proper level to prevent the transplanted kidney to function properly without risk of rejection.

95. By reason of Defendant's negligent decision to perform the surgery when it did, the transplanted kidney failed and could not be saved.

96. Plaintiff has suffered great emotional and financial harm due to Defendant's negligence, including the following financial damages:

a. The cost of maintaining Boots at the AMC until Defendant advised he was eligible for a second transplant, was more than $33,000.00;

b. The cost of a second transplant at Defendant's hospital for which Defendant has improperly charged and collected a substantial sum and is attempting to collect yet an

-24-

additional substantial sum; and

c. The time and costs incurred by Plaintiff making numerous trips to see Boots and meet with his doctors, including mileage, tolls, wear and tear on his vehicle and hotel bills and meals and incidentals of an estimated value of at least $5,000.

97.   By reason thereof, Plaintiff is entitled to a declaratory judgment that his total obligation to Defendant for its services for both Boots and any donor cat is $12,500, assuming that only a single transplant was necessary, and $25,000, in the event that a second transplant was not required due to Defendant's negligence. Accordingly, the Court should enter judgment declaring that Plaintiffs maximum obligation to Defendant does not exceed $12,500 per transplant, which was not required due to Defendant's negligence, and all charges in excess of such amount are void and uncollectible.

### Count Four

**(Violation of Pennsylvania Unfair Trade Practices And Consumer Protection Law (73.S. Section 201-1 et seq.))**

98.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 82 of this Complaint as if set forth in full.

99.   Defendant's above-described advertisement for its feline renal transplant services violates Pennsylvania's Unfair Trade Practices And Consumer Protection Law, 73 P.S.

-25-

Section 201-1 *et seq.*, in that, among other things, to Defendant's knowledge, it is false, fraudulent and deceptive, creating a likelihood of confusion or of misunderstanding in the mind of members of the public who read the advertisement and, in reliance upon it, chooses to use Defendants' services.

100.   By reason thereof, Plaintiff is entitled to a declaratory judgment that his total obligation to Defendant for its services for both Boots and any donor cat is $12,500, assuming that only a single transplant was necessary and $25,000, in the event that a second transplant was not due to Defendant's negligence.

101.   Accordingly, the Court should enter judgment declaring that Plaintiff's maximum obligation to Defendant does not exceed $12,500 per transplant and all charges in excess of such amount are void and uncollectible.

## COUNT FIVE

### (Deceptive Practices Under New York's Law Outlawing

### Deceptive Businesses Practices under NY GBL Section 349 & 350)

102.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 82 of this Complaint as if set forth in full.

103.   Defendant's above-described advertisement for its feline renal transplant services violates Sections 349 & 350 of New York's General Business in that, among other things, to

Defendant's knowledge, it is false. fraudulent and deceptive conduct which creates a likelihood of confusion or of misunderstanding in the minds of the public who read the advertisement and, in reliance upon it, chooses to use Defendants' services.

104.  By reason thereof, Plaintiff is entitled to a declaratory judgment that his total obligation to Defendant for its services for both Boots and any donor cat is $12,500, assuming that only a single transplant was necessary, and $25,000, in the event that a second transplant was not due to Defendant's negligence.

105.  Accordingly, the Court should enter judgment declaring that Plaintiffs maximum obligation to Defendant does not exceed $12,500 per transplant which was not due to Defendant's negligence, and all charges in excess of such amount are void and uncollectible.

## COUNT SIX

### (Failure to Obtain Informed Consent)

106.  Plaintiff repeats and realleges the allegations in paragraphs 1 through 82 of this Complaint as though set forth in full.

107.  By reason of Defendant's failure to fully apprise Plaintiff of all of the risks of going ahead with the transplantation, Plaintiff was unable to make an informed decision as to the risks to Boots and the cruel and inhuman suffering he would undergo and accordingly his consent to the transplantation was invalid and unenforceable and Defendant is liable to

Plaintiff for all costs and expenses he suffered as a consequence of the failure to secure his valid consent and for such harm that Boots suffered as a result, as well.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A.   On Count One: a judgment declaring that the maximum amount that Defendant is entitled to is $12,500 for a kidney transplant operation, which amount includes all services provided to both the recipient and donor cats and, as a consequence, Plaintiff has no indebtedness to Defendant and, if is found that the second transplant operation was due to Defendant's negligence, Plaintiff is entitled to a judgment against Defendant for all sums he paid to Defendant in excess of $12,500 for the single successful transplant and for all of his costs and expenses at the AMC and otherwise as may be proved at trial.

B.   On Count Two: a judgment declaring that the maximum amount that Defendant is entitled to is $12,500 for a kidney transplant operation, which amount includes all services provided to both the recipient and donor cats and, as a consequence, Plaintiff has no indebtedness to Defendant and, if it is found that the second transplant operation was due to Defendant's negligence, Plaintiff is entitled to a judgment against Defendant for all sums he paid to Defendant in excess of $12,500 for the single successful transplant and for all of his costs and expenses at the AMC and otherwise as may be proved at trial and if it be found that Defendant's fraud be willful and malicious and aimed at an victimizing an unsuspecting

-28-

public, punitive and exemplary damages in an amount to be determined together with counsel

fees.

C.  On Count Three: all of Plaintiffs' costs and expenses growing out of the failure of the first

transplanted kidney as may be proved at trial by Plaintiff.

D.  On Count Four: the Court should enter judgment declaring that Plaintiff's maximum

obligation to Defendant does not exceed $12,500 per transplant and all charges in excess of

such amount are void and uncollectable and Plaintiff is entitled to a refund of all payments in

excess of $12,500, together with interest.

E.  On Count Five: the Court should enter judgment declaring that Plaintiffs maximum

obligation to Defendant does not exceed $12,500 per transplant and all charges in excess of

such amount are void and uncollectible and should be refunded to Plaintiff together with

interest.

F.  On Count Six: all sums that Plaintiff spent and obligations he incurred as a consequence

of Defendant's failure to provide him with adequate information to allow him to give a valid

consent, in an amount to be determined at trial, but not less than $150,000.00

G.  Such other and further relief as to the Court may seem just and proper, including without

limitation costs, interest and reasonable attorneys fees.

-29-

Dated: May 6, 2014
      Warwick, New York

Max Wild
Plaintiff Pro Se
98 Distillery Road
Warwick, New York 10990
(845) 986-6931
mhw311@optonline.net

**JURY TRIAL DEMANDED**

JS

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## EASTERN DISTRICT OF PENNSY ▾

|  |  |
|---|---|
| MAX WILD,<br><br>*Plaintiff(s)*<br>v.<br>THE UNIVERSITY OF PENNSYLVANIA, d/b/a<br>Matthew J. Ryan Veterinary Hospitalt of the University<br>of Pennsylvania a/k/a Small Animal Hospital,<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. **14  2646**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* The University of Pennsylvania
133 South 36th Street, Suite 300
Philadelphia, Pennsylvania 19104
(215) 746-746-5200

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Max Wild
98 Distillery Road
Warwick, New York 10990
(845) 986-6931

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:

_____
*Signature of Clerk or Deputy Clerk*

James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, Pennsylvania 19106
(215) 597-7704

**JS**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

### EASTERN DISTRICT OF PENNSY▼

|  |  |
|---|---|
| MAX WILD, | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| THE UNIVERSITY OF PENNSYLVANIA, d/b/a | ) |
| Matthew J. Ryan Veterinary Hospitalt of the University | ) |
| of Pennsylvania a/k/a Small Animal Hospital, | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No.    **14    2646**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  The University of Pennsylvania
133 South 36th Street, Suite 300
Philadelphia, Pennsylvania 19104
(215) 746-746-5200

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Max Wild
98 Distillery Road
Warwick, New York 10990
(845) 986-6931

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, Pennsylvania 19106
(215) 597-7704